REISSUED FOR PUBLICATION
NOV 9 2016
OSM
U.S. COURT OF FEDERAL CLAIMS

ORIGINAL

# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

FILED

OCT 21 2016

OSM
U.S. COURT OF
FEDERAL CLAIMS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| SARAH BATES, as Parent and Natural Guardian of B.L.T., | * * * |
| Petitioner, | * * |
| v. | * * * |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * * * |
| Respondent. | * |

No. 13-154V
Special Master Christian J. Moran

Filed: October 21, 2016

Attorneys' fees and costs; reasonable basis.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Sarah Bates, Martins Ferry, OH, pro se;
Anne Toale, Maglio, Christopher & Toale, PA, Sarasota, FL, former counsel for petitioner;
Justine E. Walters, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION DENYING ATTORNEYS' FEES AND COSTS[1]

In creating the Vaccine Program, Congress established a system in which petitioners shall file petitions with evidence in the form of medical records or medical opinions that supports the claim contained in the petition. 42 U.S.C. § 300aa–11(c). Congress also afforded attorneys representing petitioners a highly unusual benefit: they may receive awards of reasonable attorneys' fees and costs even when the petitioner does not prevail. A non-prevailing petitioner becomes

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

eligible for attorneys' fees and costs by establishing that the petition was filed in good faith and with a reasonable basis.

Here, Ms. Bates, whom attorney Anne Toale represented for most (but not all) of the case, did not comply with the statutory requirements to submit evidence supporting her claims with the petition. The processing of Ms. Bates's claim has necessarily not been quick, but has concluded with a decision dismissing her case. Ms. Bates's former attorney, Ms. Toale, requests an award of attorneys' fees and costs. The Secretary opposes.

A review of all the evidence shows that Ms. Bates failed to establish a reasonable basis for the claims in her petition. Without some evidence supporting reasonable basis, special masters lack the authority to award attorneys' fees and costs. Thus, the motion for an award of attorneys' fees and costs is DENIED.

I.    **Facts**[2]

The medical history of B.L.T.'s extended family is potentially relevant as they were reported to have some mental illnesses. Exhibit 1 at 3, exhibit 3 at 13-14, exhibit 6 at 68, exhibit 4 at 4, 42; exhibit 9 at 3; exhibit 10 at 2, exhibit 13 at 6-7, exhibit 14 at 4. B.L.T.'s parents, too, had some mental health problems. Exhibit 1 at 4, 9, exhibit 5 at 30, exhibit 13 at 7, exhibit 14 at 4, exhibit 26 at 10 (indicating that father took phenobarbital as a child for seizures). Perhaps most significantly, B.L.T.'s mother reported that she had seizures as a toddler that she eventually outgrew. Exhibit 6 at 24; see also exhibit 5 at 30 (indicating that mother's seizure disorder lasted into adulthood).

B.L.T. was born in June 2009. Exhibit 25 at 9 (birth certificate), exhibit 18 at 28 (delivery record). The pregnancy was complicated due to known cigarette use. Exhibit 4 at 41. For her first year, records from her pediatrician are typical. The pediatrician, C.K. Jean, noted that Ms. Bates reported that B.L.T.'s leg "shakes" at a visit when B.L.T. was one month old. Exhibit 5 at 12. However, this

---

[2] The events are presented in chronological order without regard to when Ms. Bates's former attorney received the records. For reference, Ms. Toale filed exhibits 1-11 within six weeks of filing the petition.

In the following pages, the parents' complaints (symptoms) are set forth. The doctors' findings (signs) are also discussed. In several places, it appears that B.L.T.'s parents have reported information about B.L.T.'s history inaccurately.

symptom did not continue in the following months.  See generally exhibit 5 at 12-20

A local government organization provided forms to assess B.L.T.'s development at 6, 8, 12, and 14 months.  B.L.T. appeared to be developing normal through August 18, 2010, when she was two months old.  Exhibit 2 at 20-51.

On October 1, 2010, Dr. Jean saw B.L.T. because she had a cough and a runny nose for three days.  Dr. Jean assessed her with an upper respiratory infection.  Dr. Jean requested that B.L.T. return in a few weeks.  Exhibit 5 at 28.

The follow up appointment occurred on October 14, 2010.  The upper respiratory infection had resolved.  Her temperature was 97.8.  Dr. Jean administered the hepatitis A and influenza ("flu") vaccine.  Exhibit 5 at 10, 29.

Four days later, on October 18, 2010, B.L.T.'s father brought her to the emergency department of Wheeling Hospital.  He reported that B.L.T. had a fever the day before that broke with Tylenol.  She woke up fussy with another fever.  In the emergency department, B.L.T.'s fever was 103.8 degrees Fahrenheit.  The doctor discharged B.L.T. as having an infection of her right middle ear.  The time of discharge was approximately 6:00 a.m.  Exhibit 6 at 2-16.

Very late that same day, emergency medical services were called for B.L.T.  Although much of this form is not legible, it appears that the call was made at 11:29 p.m.  The reason for the call was "infant not breathing."  Exhibit 17.  The ambulance brought B.L.T. to the East Ohio Regional Hospital, where she arrived at 11:41 p.m.

In the emergency department, the doctor obtained this history of present illness:

> The patient has a history of fever for the past 5 days. She
> got her immunization shot on Friday. She had been
> having low-grade fever and admitted to Medical Park
> tonight for questionable seizure activity and fever.  The
> patient had seizure again lasting longer.  They did give
> her a shot of Rocephin yesterday. Today the child again
> was having seizure with high fever. Mother was trying to
> give Tylenol and the child was also treated for urinary
> infection. EMS was called and brought the child here.
> They admit the child had tonic-clonic seizures,

3

> intermittent eye deviations. The child cried between
> seizures.

Exhibit 4 at 2. Much of this report requires some discussion. The report of fever for "five days" seems inconsistent with Dr. Jean's record from October 14, 2010. The phrase "Medical Park" refers to Wheeling Hospital, which is located at 1 Medical Park. B.L.T. had been at Wheeling Medical Park earlier that day for fever, but the records from 5:30 A.M. do not indicate anything like "seizure activity." While the doctor at Wheeling Hospital did give Rocephin for the possible ear infection, there appears not to be any mention of a urinary infection.

In the East Ohio Regional Hospital, B.L.T. was "apparently seizing." The doctor administered "1 mg of Valium and the seizure stopped." Because the parents had reported a "history of prior febrile seizures," the doctors wanted to evaluate. This assessment included a spinal tap. After treating B.L.T. for approximately 35 minutes, the doctors transferred B.L.T. to Wheeling Medical Park. Exhibit 4 at 2-3.

B.L.T. returned to Wheeling Medical Park on October 19, 2010 at approximately 3:30 A.M. Exhibit 6 at 149 (patient registration). The health issue was "febrile seizures." Id. at 154. A nurse recorded that the reason for admission was "ill for 1 ½ wk with cold symptoms. 'Shots' at Dr. Jean's on Monday. [Increased] fever through the day." Exhibit 6 at 24. At the initial review, B.L.T. "partially meets" the standards for a seizure disorder. Id. at 29.

Later on October 19, 2010, a doctor examined B.L.T. Thea Manlapaz recorded the following history of present illness:

> The patient has been _____ [sic] with fever for the
> past 2 days. They called their pediatrician and were told
> to give Tylenol. They did as instructed and the fever
> went down. However, after a while, the fever would
> come back as the Tylenol wore off. They also noted that
> the patient had seizure-like activity when she had the
> fever, which lasted for about 10 minutes. The persistence
> of fever and concern for seizures prompted consult at
> East Ohio Regional Medical Center. They worked her up
> and did a spinal tap, which was negative for meningitis.
> She was noted to have seizures in the ER here at
> Wheeling Hospital and was given Valium.

4

Id. at 68.  The last sentence of this history appears to be slightly inaccurate in that B.L.T. was given Valium at East Ohio.  The plan was to attempt to "rule out other causes of seizures, especially epilepsy."  The doctor also ordered an EEG.  Id. at 69.

The EEG lasted approximately 20 minutes during which B.L.T. lapsed into sleep.  Significantly, the doctor interpreted the EEG as normal.  Exhibit 6 at 86.

Doctors discharged B.L.T. from Wheeling on October 21, 2010.  The brief history recorded that B.L.T. had a "febrile seizure, which lasted approximately an hour and broken at the Ohio Valley Medical Center."  During her hospital stay, B.L.T. had a fever "but did not have any seizure activity."  The discharging doctor commented that the seizures "could have been viral in nature."  He recommended follow up with a pediatric neurologist.  Exhibit 6 at 87.  At discharge, B.L.T. was neither taking nor prescribed any medications.  Id. at 82.

Before B.L.T. saw a pediatric neurologist, she returned to her pediatrician, Dr. Jean.  The intake history indicates that B.L.T. had been getting a fever "off & on."  However, B.L.T. has had "no seizure since coming home."  Exhibit 5 at 29 (Oct. 28, 2010).  Dr. Jean stated "No further investigation is indicated unless . . . seizure should relapse."  Id. at 30.

On November 12, 2010, B.L.T. had her first evaluation with Bilal Sitwat, a pediatric neurologist affiliated with the Children's Hospital of Pittsburgh.  The family informed Dr. Sitwat that a few days after the flu shot, B.L.T. had a seizure.  "The seizure was described as initially having a blank stare followed by shaking and twitching of all four extremities.  This lasted [a] few minutes initially then stopped followed by recurrence several times off and on for about an hour.  She was taken to the Local Emergency Department."  Exhibit 1 at 3.  As part of the neurologic examination, Dr. Sitwat assessed B.L.T.'s mental status.  He found she was "awake, alert, and developmentally appropriate."  Id. at 4.  Dr. Sitwat recommended a prolonged EEG and an MRI.  He also prescribed a Diastat rectal suppository for any seizure lasting more than five minutes.  Finally, he counseled that a "febrile seizure is very common and benign phenomenon."  He advised waiting to see if B.L.T. was disposed to developing epilepsy with a follow up appointment in six months.  Id. at 4-5.

The next few months appear relatively uneventful.  B.L.T. visited Dr. Jean in December for another upper respiratory infection.  In February 2011, Dr. Jean commented that B.L.T. might have asthma.  Exhibit 5 at 33-37.  At the end of February 2011, Dr. Jean was concerned about B.L.T.'s gait and, therefore, referred

her to a program at Easter Seals. Id. at 38. On March 10, 2011, the local government organization again assessed B.L.T.'s development, using checklists for 18 months and 20 months. She was, again, within normal limits. Exhibit 2 at 8-19.

On March 16, 2011, B.L.T.'s father brought her to Wheeling Hospital because she vomited "'curdled milk.'" As part of the review of systems, the doctor recorded that B.L.T.'s father "denies any problems such as headaches, dizziness, weakness, numbness, or developmental delays." The doctor's impressions included sinusitis and bronchitis. Exhibit 6 at 157-65.

Two days later, B.L.T.'s mother returned with B.L.T. to Wheeling Hospital because of fevers, vomiting, and diarrhea. The review of the neurologic system was the same. She was kept overnight and discharged the following day. Id. at 177-84. The medication log for this hospitalization does not include any anti-seizure medications. See id. at 284.

On March 30, 2011, B.L.T. had her first of many appointments at Easter Seals. Ms. Bates completed a health report, noting that she had concerns about B.L.T.'s weight, behavior, speech / language, and seizures. Exhibit 3 at 7. Ellen Kitts, a pediatric physiatrist, examined her because Dr. Jean had referred B.L.T. for an abnormal gait.[3] For this problem, Dr. Kitts concluded that B.L.T. has "pronation, pes planus and hypermobile joints." Id. at 15.

These problems seem not to be linked to the vaccination. However, Dr. Kitts's report includes other information. B.L.T.'s parents told Dr. Kitts that "She did well until she developed H1N1 flu. She had a temp of 105. She developed seizures. She was apneic. They are concerned that she now jerks in her sleep and does not sleep well because of the jerking." Id. at 14.[4] On April 16, 2011, B.L.T.'s parents brought her back to Dr. Jean for a "recurrent low-grade fever lasting one to two days, in the last two weeks." Dr. Jean's recitation of the parents' report also included that B.L.T. "has had eye staring episodes which suggest seizure, for which she is receiving [an] evaluation at pediatric neurology at Clinic.

---

[3] Physiatry is the branch of medicine that emphasizes "rehabilitation from resultant impairments and disabilities." Dorland's Illus. Med. Dictionary at 1443 (32d ed. 2012).

[4] The reference to "H1N1 flu" is probably not accurate. Instead, the parents probably intended to communicate that B.L.T. was well until she received a flu vaccine, which included a vaccine against H1N1 flu virus.

A follow-up appointment has been scheduled within one month. She is on medication from the neurologist." Dr. Jean's plan included encouraging B.L.T.'s parents to keep the appointment with the pediatric neurologist. Dr. Jean also ordered additional vaccinations. Exhibit 5 at 40.

According to the attorneys' timesheets, Ms. Bates consulted an attorney on April 25, 2011. Confirmation comes from an April 26, 2011 report from Dr. Jean, who stated: "Parents are speaking with lawyers re: reaction pt had to flu vaccine - mom said she was told the lot pt got was 'a bad batch.'" Dr. Jean also recorded that B.L.T. "has staring spells – 'shakes' while sleeping." Exhibit 5 at 41.

Dr. Jean's April 16 and 25, 2011 reports of "staring spells" are the first reports of this problem occurring to B.L.T. Neither report stated when the staring spells began. Further reports of staring spells are found in records from Easter Seals. Exhibit 3 at 26 (May 4, 2011), exhibit 3 at 34 (Dr. Kitts on July 27, 2011). On August 8, 2011, Dr. Kitts completed a referral to a neurologist for febrile seizures and staring spells. Exhibit 9 at 10.

On August 18, 2011, the local agency again assessed B.L.T.'s development, using questionnaires for 24 and 27 months. Exhibit 2 at 52-63. Ms. Bates reported that she was concerned about B.L.T.'s "seizures and ADHD." Id. at 62. However, B.L.T. appeared to be developing within normal limits.

B.L.T. saw a pediatric neurologist on October 13, 2011. Dr. A. Latif Khuro recorded this history. "B.L.T. has paroxysmal events since October 2010. After vaccination she developed fever and had seizure that lasted for more than 60 minutes. Seizures were clonic. She was admitted to Wheeling Hospital and was discharge[d] on Diastat." For B.L.T.'s current condition, her parents told Dr. Khuro that B.L.T. has "two different types of seizures," one tremulous and one frozen. Exhibit 9 at 2.

During the visit with Dr. Khuro, B.L.T. underwent an EEG. The report does not state the duration of EEG, but the procedure was conducted while B.L.T. was awake and asleep. The result was interpreted as normal, which was consistent with her previous EEG. Id. at 8. With this information, Dr. Khuro came to the impression that B.L.T. had: "1. Febrile seizure 2. Staring episodes most likely non epileptic 3. Jerking episodes so frequent with normal EEG indicate less likely to be epileptic 4. Rocking." Dr. Khuro recommended that the family keep a log book and attempt to record a video of an episode. Dr. Khuro also stated: "Mom was very unhappy at [the] end of consultation when told that EEG was normal and less

likely seizure.  She was saying 'how [is] [it] possible [that] someone can diagnose seizures with 30 minute EEG?'"  Exhibit 9 at 5.

On November 9, 2011, Dr. Kitts saw B.L.T. again for her ongoing problem with pronation and pes planus.  Again, Dr. Kitts also recorded other information.  "She had a 20-minute EEG that was negative.  She is scheduled for an overnight EEG in the future.  The family is very angry because she has had seizure-like discharges on other EEGs that were more extensive.  The family continues to have concerns that she has ADHD."  Exhibit 7 at 2.[5]  Dr. Kitts's impression was that "her musculoskeletal system is stable."  With respect to the family's concerns about ADHD, Dr. Kitts recommended that they "work with neurologists and sleep specialists to find the best diagnosis and treatment for what appears to be seizures."  Id.

On a referral from Dr. Kitts, B.L.T. was evaluated at the Wheeling Hospital Center for Pediatrics Autism Spectrum Disorder Diagnostics on January 18 and 25, 2012.  The evaluating doctor, Judith T. Romano, concluded that B.L.T. did not have autism.  Exhibit 21 at 3-6.

On February 5, 2012, B.L.T. was admitted to Children's Hospital of Pittsburgh.  Exhibit 28 at 1.  The purpose was for testing.  B.L.T. had an MRI, which was "unremarkable."  Exhibit 27 at 76.  B.L.T. also underwent a 23 hour video EEG.  During this testing, the parents pressed a button three times to note when they were observing a clinical event.  See id. at 73.  The pediatric neurologist reporting about the results of the EEG stated these three "clinical events of staring and poor responsiveness were noted by the parent during the study.  These events had no EEG correlate and were not felt to represent seizures."  Overall, the EEG was "normal for age and state. . . . [N]o areas of focal slowing or epileptiform abnormalities were noted."  Id. at 79.

In a report following an evaluation on March 13, 2012, Dr. Sitwat discussed the EEG and MRI.  Dr. Sitwat's introduction also states "At some point, she was diagnosed with autism and ADHD.  She does exhibit several features of ADHD."[6]  For seizures, Dr. Sitwat stated:  "She had history of febrile seizure.  The seizure

---

[5] From the undersigned's review of the record, B.L.T. had undergone an EEG twice: once on October 22, 2010 and again on October 13, 2011.  On both occasions, the EEG was normal.

[6] The basis for the statement that B.L.T. was diagnosed with autism is not readily apparent.  Dr. Romano found that she did not have autism.

was described [as] prolonged about one hour long.  They have Diastat for rescue medicine.  She has not had any seizures with and without fever." Exhibit 10 at 1. Dr. Sitwat stated that "spells appeared to be low tension or behavior or stereotyp[]es.  Evidence available does not suggest these are seizures or if she has seizure tendency."  He recommended observations and a consultation with a psychiatrist for ADHD.  Id. at 3.  About two months later, Dr. Sitwat made similar evaluations and recommendations.  Exhibit 28 at 55-57.

Following the referral from Dr. Sitwat, Imad Melhem, a psychiatrist at Neurobehavioral and Mental Health Services, saw B.L.T. on July 12, 2012. Exhibit 13 at 5-8.[7]  The history begins with the vaccine.  The parents told Dr. Melhem that the "seizures started right after the vaccine and over two days had multiple seizures, until the seizure that lasted one hour two days after the shot and [B.L.T.] quit 'breathing for 2 seconds' per her mother and kept going in and out of breathing and the cops took her to the hospital."  Id. at 5.  After the hospitalization, B.L.T. has not had any grand-mal seizures.  The parents also told Dr. Melhem that B.L.T. has staring spells and becomes unresponsive "for [a] few seconds up to 15 minutes."  Id.  The parents also stated that B.L.T. is hyperactive, is very emotional, and throws things.  Dr. Melhem's recording of past psychiatric history includes: "Dr. Kitts diagnosed her with ADHD and Dr. Romano suspected Asperger's."  Id. at 6.  In the developmental history, Dr. Melhem has noted that the parents "have a legal case against the FDA related to the vaccine and the vaccine manufacturer." Id.  Dr. Melhem diagnosed B.L.T. as having "pervasive developmental disorder, NOS."  He attempted to explore ways of coping with impulsivity.  Id. at 7.

On September 17, 2012, a head start program assessed B.L.T.'s ability to learn.  She scored within the "typical" range on the tests, although her score in the domain of behavioral concerns was at the 21st percentile.  Exhibit 20 at 3-12. Behavior problems appeared in a report that Dr. Kitts authored on October 9, 2012. Exhibit 12 at 4.

Dr. Melhem expanded the discussion of behavioral concerns in a report dated October 17, 2012.  B.L.T. was "aggressive," "continues to fidget," "forgetful," and "easily distracted."  Dr. Melhem's diagnoses were pervasive

---

[7] Dr. Melhem's report also appears as exhibit 16.  In both locations, the report is not organized and contains some clerical errors, such as using male pronouns in reference to B.L.T.

developmental disorder NOS and attention deficit hyperactivity disorder NOS.  He recommended Clonidine.[8]  Exhibit 13 at 3-4.

Approximately six months later, Dr. Melhem saw B.L.T. again.  His description of B.L.T.'s symptoms was relatively similar.  B.L.T.'s mother stated that she was not giving her Clonidine and the doctor discontinued this medication.  Dr. Melhem referred the family to psychotherapy.  Exhibit 11 at 3-4.

Dr. Melhem's February 27, 2013 report appears to be the last report created before Ms. Toale filed the petition on March 4, 2013.  The petition alleged that B.L.T. "suffer[s] from neurological and behavioral problems" and that B.L.T.'s "injuries are causally related to the vaccinations administered on October 14, 2010."  Petition, ¶¶ 7-8.

After the petition was filed, B.L.T.'s appointments with medical professionals occurred less frequently.  On April 9, 2013, Dr. Kitts determined that her shoes fit well.  Dr. Kitts also noted that B.L.T. had been diagnosed "with bipolar as well as anger issues."  In this context, Dr. Kitts stated B.L.T. "is seeing a counselor."[9]

On June 27, 2013, Dr. Melhem reported that B.L.T.'s behavioral problems are worse, although she did well in pre-school.  He recommended starting melatonin.  The records from the public school system, but not from Dr. Melhem's office, contain a more detailed treatment plan dated June 27, 2013.  The treatment plan lists "autism spectrum" as a diagnosis and a reduction in head banging as a goal.  Exhibit 25 at 26.

Although the basis for Dr. Melhem's diagnosis of autism is not entirely clear, Dr. Kitts, on October 10, 2013, stated Dr. Melhem "diagnosed her with Asperger's, autism spectrum, ADHD, and bipolar."  B.L.T.'s mother told Dr. Kitts that the family has not located a counselor / behavior specialist for B.L.T.  Dr. Kitts continued to assess B.L.T.'s shoes and also recommended another therapist.  Exhibit 23 at 4.

---

[8] Clonidine was probably prescribed for the treatment of attention deficit hyperactivity disorder.

[9] The record does not contain any reports from a counselor.

On May 22, 2014, Ms. Toale wrote a letter requesting Dr. Kitts's assistance. Exhibit 23 at 8. Dr. Kitts penned a handwritten response on June 10, 2014. Dr. Kitts wrote: "I had referred them to [illegible] neurology to one who specializes in vaccine related problems. I don't know if they went. I never got a report. My job is functional not diagnostic." Exhibit 23 at 12.

On November 20, 2014, the family returned to Nationwide Children's Hospital because of staring and not paying attention. Exhibit 24 at 5. The doctor referred them to a neurologist. Id. at 7.

The appointment with the neurologist at Nationwide took place nearly a year later on October 5, 2015.[10] After obtaining a history and conducting an examination, the impression of the neurologist, Dr. Albert, was that "it is unclear if staring spells are truly seizures, however she is at increased risk for epilepsy given family history and possible underlying neurodevelopmental disorder. Her neurologic exam, apart from being hyperactive[,] is normal today." Dr. Albert requested an opportunity to review previous imaging and recommended more imaging. Exhibit 26 at 8-12. It appears that another EEG took place on November 12, 2015 but the result of that testing was not located. See exhibit 26 at 6 (listing encounters at Nationwide).

## II.   **Procedural History**

As mentioned in the recitation of facts, Ms. Bates consulted her former attorney, Ms. Toale, on April 25, 2011, approximately 6.5 months after B.L.T. received the flu vaccine. Over the next 22 months, paralegals obtained medical records.[11] During this nearly two-year period, Ms. Toale spent approximately 16 hours primarily supervising the gathering of records and communicating with her client. Very few of Ms. Toale's tasks suggest that she was reviewing the content of medical records.

---

[10] Ms. Toale reported that the appointment with the neurologist was scheduled and rescheduled multiple times. Sometimes the doctor's office requested the change and other times, B.L.T.'s family required a new appointment time.

[11] The paralegals' description of their work would provide more information if they had specified the provider of the medical record (for example, Dr. Jean or Dr. Sitwat) rather than used the generic term "medical records."

## A.   Filing the Petition through Proposed Withdrawal of Counsel

On behalf of Ms. Bates, Ms. Toale submitted the petition to the Clerk's Office on March 4, 2013.  The first set of medical records was submitted on compact disc on April 22, 2013.  Additional records were filed on June 17, 2013 and August 30, 2013.

The Secretary reviewed this material in her report, submitted pursuant to Vaccine Rule 4 on October 29, 2013.  The Secretary contended that Ms. Bates did not establish entitlement to compensation because Ms. Bates had not produced a medical record or medical opinion supporting her claim.

In the initial status conference, which was held on November 25, 2013, Ms. Toale represented that she was working on getting an expert report.  The timesheets show that approximately five months earlier, on June 24, 2013, Ms. Toale had already emailed a potential expert, who was later identified as Dr. Marcel Kinsbourne.  On July 29, 2013, Ms. Toale reviewed a draft report and on August 5, 2013, Ms. Toale reviewed a final report.  On August 12, 2013, Ms. Toale emailed an expert.  Although Ms. Toale has not described the content of this communication, one week later a paralegal reviewed an invoice from Dr. Kinsbourne.

Between August 5, 2013 and November 24, 2013 (the day before the status conference), the timesheets show no efforts to obtain an expert.  On November 25, 2013, the day of the status conference in which Ms. Toale reported she was working on getting an expert, the timesheets show Ms. Toale had "e-mails with expert."  Again, no details are provided but on the following day, a paralegal has approved an invoice from an expert.[12]  Based upon Ms. Toale's representation, Ms. Bates was given 60 days to file a status report, identifying her expert and proposing a date for the filing of the expert's report.  Order, issued Nov. 25, 2013.

As ordered, Ms. Toale filed a status report.  It stated "To date, undersigned counsel has not been able to locate an appropriate expert" and proposed an expert report deadline of 90 additional days.  Pet'r's Status Rep., filed Jan. 27, 2014.  The statement that counsel has not located an expert was correct.  However, the timesheets from between November 25, 2013 and January 27, 2014, contain no indication that Ms. Bates's legal team made any further efforts to obtain an expert.

---

[12] The only invoice from an expert contained in the attorneys' lists of costs is from Dr. Kinsbourne.

In response to the January 27, 2014 status report, Ms. Bates was ordered to file a status report by February 28, 2014, and an expert report by April 28, 2014. Order, issued Jan. 29, 2014.

On February 28, 2014, Ms. Toale filed a status report, stating that she intended to withdraw from the case but that Ms. Bates intends to pursue the case pro se. Ms. Toale also represented that she would file a motion to withdraw after she filed her application for an award of attorneys' fees. Pet'r's Status Rep., filed Feb. 28, 2014.

This status report prompted a status conference on March 6, 2014. Ms. Toale repeated her intention to file a motion for an award of attorneys' fees on an interim basis and, then, to file a motion to withdraw as counsel. The Secretary responded that she might object to a motion for an award of attorneys' fees on an interim basis. Ms. Toale responded that she would delay filing her motion to withdraw until after she was awarded attorneys' fees.

The next day, acting for Ms. Bates, Ms. Toale filed a motion for an award of attorneys' fees on an interim basis.[13] The motion requested $16,438.00 in attorneys' fees and $5,677.98 in costs. The largest item of cost was for Dr. Kinsbourne's review.

## B.    Development of Arguments regarding the Motion for Attorneys' Fees

The Secretary opposed the motion, largely due to the interim nature of the request.[14] The Secretary also proposed that after discussions with Ms. Toale, "$20,000 is not an unreasonable amount for fees and costs." Resp't's Resp., filed March 24, 2014, at 8.

On April 28, 2014, Ms. Bates, still represented by Ms. Toale, filed a motion for an enlargement of time to file an expert report, which had been set in the January 29, 2014 order. This motion was discussed in a May 21, 2014 status conference.

---

[13] Although the initial timesheets end on March 5, 2014, Ms. Toale submitted updated time sheets on July 7, 2016.

[14] Because Ms. Bates's case has concluded, any arguments regarding an interim award are moot.

This status conference began with an inquiry into the Secretary's views about the reasonable basis of the petition. After struggling to present her position orally, the Secretary requested an opportunity to present her position regarding reasonable basis in writing. The Secretary's expressed concerns about reasonable basis affected Ms. Toale's position. Although, as counsel of record, she was expected to comply with the January 29, 2014 order to obtain an expert report, Ms. Toale explained that she did not want to prosecute a case in which reasonable basis was questioned. Ms. Toale's proposed solution was to request that the deadline for filing an expert report be suspended while the parties addressed reasonable basis.

Following the status conference but still on May 21, 2014, Ms. Toale's timesheets indicate that she "draft[ed] letter to treaters; review[ed] reasonable basis" for one hour. One letter is contained in the record as part of Dr. Kitts's file. Exhibit 23 at 8. In the following few months, Ms. Toale or paralegals in her office attempted to communicate with several treating doctors. On behalf of Ms. Bates, Ms. Toale filed a response from only one treating doctor, Dr. Kitts. Whether Ms. Toale received any response to these letters that she did not file is not known.

Ms. Toale's efforts to obtain information from treating doctors overlapped with the Secretary's preparation of a brief regarding reasonable basis. The Secretary's ensuing brief contains a fairly lengthy discussion about cases interpreting "reasonable basis." Resp't's Br. regarding Reasonable Basis, filed July 2, 2014, at 7-18. With respect to the particular facts of this case, the Secretary raised several issues, including the lack of an expert report. The Secretary asserted: "to date no expert report or theory of causation has been provided and it is unclear what sequela petitioner is alleging were caused by her vaccination(s)." Id. at 19. The Secretary also proposed deferring the question of reasonable basis until Ms. Bates submitted additional evidence. Id. at 20.

Still acting as Ms. Bates's counsel of record, Ms. Toale addressed the question of reasonable basis. Ms. Bates argued that B.L.T. "had been on seizure medication, which can have untoward side effects, and her initial seizure was complex (tonic-clonic) and lengthy – an hour long. Under these circumstances, it was reasonable to file a petition and seek expert support for a connection between the vaccine, the initial seizure and the continuing problems." Pet'r's Reply on Reasonable Basis, filed Aug. 29, 2014, at 2. In addition, "a prior finding that the precise injury alleged 'can' be vaccine caused, accompanied by a generally-accepted appropriate temporal interval makes a similar claim potentially successful or at least makes the claim feasible. The medical records in this case establish the vaccine receipt, the evolution of symptoms including an investigation of continued symptomatology, which, taken together with vaccine case precedent, constituted a

reasonable basis to file the claim." Id. at 4. Finally, the brief requested payment on an interim basis to facilitate the withdrawal of counsel.

The Secretary, then, filed a reply to this brief. The Secretary argued that Ms. Bates's arguments "improperly focus on the (subjective) reasonableness of her attorneys' actions instead of the (objective) evidentiary basis for the underlying causation claim." Resp't's Reply to Pet'r's Resp. regarding Reasonable Basis, filed Sept. 5, 2014, at 1. The Secretary further argued that "counsel is required to conduct fundamental due diligence to establish a reasonable basis for the claim before filing a petition." Id. at 2 (emphasis in original). This brief appeared to complete the series of briefs regarding attorneys' fees, although other briefs were later filed unexpectedly.

### C.   Additional Efforts to Obtain a Medical Opinion and Conclusion of the Merit Portion of the Case

In an October 20, 2014 status conference, Ms. Toale reported that Ms. Bates was attempting to obtain referrals about B.L.T.'s condition. Ms. Toale, therefore, was willing to continue to represent Ms. Bates. Thereafter, there were several status reports and status conferences to discuss the ongoing efforts to obtain review by neurologists, which, after a lengthy delay, took place on October 5, 2015. Exhibit 26 at 8-12. The ensuing reports from doctors at the Nationwide Clinic are discussed in the facts section above.

Eventually, on March 2, 2016, which was approximately two years after withdrawal was first raised as a possibility, Ms. Toale filed her motion to withdraw. After allowing time for Ms. Bates to respond and not receiving any response from Ms. Bates, the undersigned granted Ms. Toale's motion to withdraw. Order, issued April 15, 2016.

On May 10, 2016, Ms. Toale, who was no longer counsel of record, filed a motion for leave to file pleadings relating to attorneys' fees and costs. Ms. Toale also requested an opportunity to reply to any submissions from the Secretary. Ms. Toale served a copy of her motion on Ms. Bates and the Secretary.

The Secretary opposed Ms. Toale's motion at least in part. It appears the Secretary did not object to Ms. Toale submitting an additional brief, because the Secretary quoted Vaccine Rule 15, which states "the special master may afford all interested individuals an opportunity to submit relevant written information within 60 days after publication of notice of the petition in the Federal Register, or later with leave of the special master." However, the Secretary maintained that she

could not disclose information to Ms. Toale because Ms. Bates had not consented to the disclosure of the information. Resp't's Mot. for Order to Show Cause and Resp. to Former Counsel's Mot. for Leave to File Pleadings related to Attorneys' Fees and Costs, filed May 24, 2016, at 4, citing 42 U.S.C. § 300aa–12(d)(4)(A) and Vaccine Rule 18. Thus, the Secretary served only Ms. Bates, not Ms. Toale.

Ms. Toale was permitted to file an additional brief regarding reasonable basis. Order, issued June 16, 2016. Ms. Toale did so on July 7, 2016. That brief constitutes the last meaningful brief regarding attorneys' fees.[15]

As to the merit of Ms. Bates's case, after an order to show cause was issued, Ms. Bates did not respond. Because she was not prosecuting her case, the case was dismissed on August 2, 2016. 2016 WL 4718106. The only remaining issue concerns whether Ms. Bates is eligible for an award of attorneys' fees.

## III.   Standards for Eligibility for Attorneys' Fees

Under the "American rule," each litigant pays for its participation in litigation. Baker Botts, L.L.P. v. ASARCO, L.L.C., 135 S.Ct. 2158, 2160 (2015). However, the Vaccine Act (like many other statutes) shifts the responsibility for fees under certain circumstances. First, when a petitioner in the Vaccine Program receives compensation, the special master "shall" award reasonable attorneys' fees and costs. 42 U.S.C. § 300aa–15(e)(1). Because Ms. Bates did not receive compensation, an award of attorneys' fees is not mandatory in this case. Instead, her attorney relies upon a second provision in the Vaccine Act. When the

---

[15] In retrospect, allowing Ms. Toale to file a brief regarding reasonable basis after she withdrew as counsel of record complicated the procedural posture of the case. The Secretary had filed a reply brief regarding reasonable basis on September 5, 2014, and Ms. Toale did not file her motion to withdraw until March 2, 2016. In these 18 months, Ms. Toale could have filed the brief.

The complication concerns access to information. Due to the closed nature of cases in the Vaccine Program, the Secretary stopped sending information about Ms. Bates's case to Ms. Toale once Ms. Toale was no longer counsel of record. (The Secretary's vigilance seems to overlook the fact that Ms. Toale, as counsel of record, supplied all the information about Ms. Bates to the Secretary --- Ms. Bates did not file anything as a pro se.)

Because of concerns about receiving ex parte submissions, the undersigned stated that whether the Secretary should respond to Ms. Toale's brief would be determined later. Order, issued June 16, 2016. However, without waiting for this further instruction, the Secretary filed a substantive response to Ms. Toale's July 7, 2016 brief on August 31, 2016. The Secretary did not serve Ms. Toale. The undersigned has not reviewed the Secretary's August 31, 2016 brief.

petitioner does not receive compensation, "the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." Id. Thus, non-prevailing petitioners must establish two conditions precedent for being eligible for an award of attorneys' fees: "good faith" and "reasonable basis." Here, resolution of Ms. Bates's good faith is not required because the remaining element (whether "there was a reasonable basis for the claim for which the petition was brought") is dispositive.

The Federal Circuit has not interpreted this phrase or provided any guidance as to how petitioners satisfy the reasonable basis standard. Chuisano v. Sec'y of Health & Human Servs., 116 Fed. Cl. 276, 285 (2014) (citing Woods v. Sec'y of Health & Human Servs., 105 Fed. Cl. 148 (2012)). In the absence of guidance, special masters have taken different approaches. Silva v. Sec'y of Health & Human Servs., No. 10-101V, 2012 WL 2890452, at *8-9 (Fed. Cl. Spec. Mstr. June 22, 2012), mot. for rev. denied, 108 Fed. Cl. 401 (2012).

Recent decisions have examined whether any evidence supports "the claim for which the petition was brought." The statute's use of the phrase "reasonable basis for the claim for which the petition was brought" is consistent with other portions of the statute that require the petition to be filed with evidence. See Chuisano v. Sec'y of Health & Human Servs., No. 07-452V, 2013 WL 6234660, at *8-10 (Fed. Cl. Spec. Mstr. Oct. 25, 2013), mot. for rev. denied, 116 Fed. Cl. 276 (2014).[16] Evidence that is relevant to determining whether there is reasonable basis for a claim may include medical records, affidavits from percipient witnesses, and opinions from retained experts. See 42 U.S.C. § 300aa–11(c).

---

[16] Although the undersigned's decision in Chuisano indicated that petitioners may satisfy the reasonable basis standard by submitting "evidence," the Chief Judge in some respects agreed and in some respects disagreed. The Chief Judge agreed with the emphasis on "evidence." But, the Chief Judge also stated that a more amorphous standard would be appropriate, one that took into account the "totality of the circumstances." Chuisano, 116 Fed. Cl. at 286.

At first blush, the "totality of the circumstances" may seem different from the undersigned special master's approach to look at the evidence. However, the issues the Chief Judge identified as part of the totality of the circumstances are, generally speaking, issues resolved by analyzing evidence. The primary point of departure between the two opinions in Chuisano is whether the actions of the petitioner's attorney are relevant to the reasonable basis inquiry.

When some (as yet undefined) quantity and quality of evidence supports the claim for which the petition was brought, then the petitioner satisfies the reasonable basis standard. However, when the only evidence supporting the claim that the vaccine caused an injury is a sequence of events in which the vaccination preceded the injury, then the petitioner does not satisfy the reasonable basis standard. Chuisano, 116 Fed. Cl. at 287 ("Temporal proximity is necessary, but not sufficient.").

"The burden is on the petitioner to affirmatively demonstrate a reasonable basis." McKellar v. Sec'y of Health & Human Servs., 101 Fed. Cl. 297, 305 (2011), decision on remand vacated, 2012 WL 1884703 (May 3, 2012).

## IV.   Analysis

As set forth above, the two tests for examining reasonable basis largely overlap. One test, presented in the special master's Chuisano decision, focuses on evidence. The other test, presented in the chief judge's opinion in Chuisano, emphasizes evidence but also contemplates a review of the attorneys' actions. In conformity with the Chief Judge's opinion in Chuisano, this decision evaluates both the evidence (section A, below) and the attorney's actions (section B, below). But, the selection of tests is not important because the result is the same. The analysis begins with a review of the evidence.

### A.   Evidence concerning Reasonable Basis

When making a decision regarding entitlement, the Vaccine Act specifies the type of evidence on which a special master may rely: "medical records or medical opinion." 42 U.S.C. § 300aa–13(a)(1). By extension, this same type of information is useful to deciding whether reasonable basis supports the claims in the petition.[17]

### 1.   Medical Opinion

This section is straightforward: Ms. Bates did not present any opinion from a specially retained expert supporting her claim. There is a lack of evidence.

---

[17] In contrast, when deciding whether a petitioner acted in good faith in filing the petition, the special master may look to other evidence, such as affidavits, because the good faith aspect of the case is subjective.

Ms. Bates argues that the failure to file a report from an expert does not preclude a finding of reasonable basis. Pet'r's Reply on Reasonable Basis, filed Aug. 29, 2014, at 5. This argument is fine but, as the Secretary maintains, the petitioner bears the burden of establishing reasonable basis. Resp't's Reply, filed Sept. 5, 2014, at 1; see also McKellar, 101 Fed. Cl. at 305. The lack of a report (meaning a lack of evidence) does not assist Ms. Bates in meeting her evidentiary burden that reasonable basis supported the claims contained in the petition.

### 2.    Medical Records

The undersigned has reviewed all the medical records and a summary is presented in section I. above. The undersigned has not located any doctor who suggested that the vaccine harmed B.L.T. Moreover, some evidence from the treating doctors indicates that the doctors did not consider the vaccine as the cause of B.L.T.'s illness. Relevant passages include:

- The remark by the doctor who discharged B.L.T. from the hospital on October 21, 2010: the seizures "could have been viral in nature." Exhibit 6 at 87.
- Dr. Sitwat's view that a "febrile seizure is common and benign." Exhibit 1 at 4-5.
- Dr. Jean's perspective that after one seizure, no further investigation is needed. Exhibit 5 at 30.
- Dr. Jean's recommendation to re-vaccinate B.L.T. Exhibit 5 at 40 (record from April 16, 2011).
- The normal EEGs. Exhibit 6 at 86 (Oct. 22, 2010), exhibit 9 at 8 (Oct. 13, 2011), exhibit 28 at 79 (Feb. 5, 2012).
- The normal MRI. Exhibit 27 at 76.

Admittedly, if the issue were did the treating doctors exonerate the vaccination, these statements are not particularly strong. However, the issue in determining whether reasonable basis supported the claim is whether the treating doctors' medical records show some evidence of a causal connection between the vaccination and the illness. These statements are not affirmative proof for what Ms. Bates is required to establish to be eligible for an award of attorneys' fees: reasonable basis.

In the briefs Ms. Toale filed, acting either in her capacity as counsel of record or in her individual capacity, Ms. Toale cited only one of these medical records. She contended that Dr. Sitwat "noted the possibility that the fever and initial seizure were caused by the vaccine." Former's Counsel Br. at 9 n.6, citing

exhibit 1 at 5. However, Dr. Sitwat's record does not match Ms. Toale's description of it. Dr. Sitwat wrote: "The patient had a prolonged seizure in the setting of fever two days after receiving H1N1 shot." Exhibit 1 at 5. Dr. Sitwat is documenting a simple sequence of events in which the vaccination preceded the seizure. A note of temporal sequence is not the same as a statement of causation. Grant v. Sec'y of Health & Human Servs., 956 F.2d 1144, 1148 (Fed. Cir. 1992); Caves v. Sec'y of Health & Human Servs., 100 Fed. Cl. 119, 140 (2011).

There remains one other record from a treating doctor in which a doctor commented on a potentially causative role for the vaccination — Dr. Kitts's handwritten response to a letter Ms. Toale sent. Ms. Toale had asked if Dr. Kitts could comment on any connection between the initial seizure and B.L.T.'s later problems. Dr. Kitts responded that she referred the family to a neurologist. Exhibit 23 at 12 (letter dated June 10, 2014).

In sum, B.L.T. has seen many doctors. Although her parents often mentioned that the vaccination preceded her seizure, it appears that no treating doctor suggested that the vaccination harmed her. Thus, the "medical records" do not support a finding of reasonable basis for the claims made in petition. In addition, Ms. Bates did not file a "medical opinion" in support of those claims. Consequently, the evidence does not support a finding of reasonable basis.

## B.  Totality of the Circumstances, including Actions and Omissions of the Attorney

Pursuant to the undersigned's interpretation of the Vaccine Act, petitioners meet (or do not meet) the reasonable basis standard by submitting evidence. Under this view, the foregoing analysis suffices. However, the undersigned is aware that some non-binding precedent indicates that the actions of an attorney should be considered in examining whether there is a reasonable basis for the claim for which the petition was brought. The undersigned, therefore, presents this additional analysis.

Ms. Toale's timesheets fail to document that she acted with due diligence in investigating the claim before she filed the petition. She had ample amount of time to review the medical records and to consult an expert before confronting the deadline set in the statute of limitations.

Between the initial contact with Ms. Toale's office and the decision to file a petition, the preliminary and foundational task for Ms. Toale and the people

working with her was to gather the medical records.[18] Ms. Toale's staff seemed to accomplish this task with reasonable competence.

However, the attorney's due diligence requires more than the simple collection of medical records. The attorney must take some time to analyze the content of those records. Here, the timesheets are not very clear. Multiple time entries (usually for 0.1 hours) show a paralegal "review[ed] and organize[d] medical records." But, before the petition was filed, did anyone analyze the medical records? The timesheets do not mention the preparation of a chronology, which would help understand the sequence of events in B.L.T.'s life.

To be sure, Ms. Toale did spend some time reviewing the records. E.g., entries for Oct. 14, 2011, Jan. 6, 2012, April 24, 2012. Nevertheless, it does not appear that Ms. Toale scrutinized the records adequately, given the ample time she had to do so. A thorough review of the medical records reveals the following potential complications in B.L.T.'s case, presented in chronological order.

Family History. On multiple occasions, B.L.T.'s parents stated that they suffered from seizures as children. This history suggests — but certainly does not prove — that the seizures may have a genetic origin.[19]

Duration of Initial Seizure. In Ms. Toale's most recent brief, she premises some points on the assertion that B.L.T.'s seizure lasted one hour. See Former Counsel's Br. at 11, 14. However, the medical records, especially the records created contemporaneously with the seizure, are not clear on this point.

During the hospitalization for the seizure, Dr. Manlapaz authored a note stating that the seizure "lasted about 10 minutes." Exhibit 6 at 68 (October 19,

---

[18] At least four paralegals contributed to this effort. Assessing their efficiency is hampered by the omission of the name of the particular provider of medical records.

[19] Some doctors that treated B.L.T. suggested that B.L.T. was at increased risk for epilepsy due to her family background. Exhibit 26 at 12. During a November 12, 2010 consultation, Dr. Sitwat stated that "it may be hard to differentiate between febrile seizure or seizure occurring in the setting of fever in the children who are predisposed to have epilepsy." Exhibit 1 at 5. As Ms. Bates's attorney, Ms. Toale was responsible for reading the medical records and knowing that the doctors were thinking about a genetic cause to any seizures.

Alternatively, the family history could suggest that B.L.T. was vulnerable to having a seizure and needed an outside factor to trigger the seizure. But, because no treating doctor suggested the vaccine triggered the seizure, Ms. Bates required an expert to present this theory.

2010).  About a month later, Dr. Sitwat added additional information:  the seizures reoccurred several times over the course of an hour with crying in between episodes.  Exhibit 1 at 3 (Nov. 12, 2010).  Since these statements were given close in time to the events in question and given in the context of seeking medical treatment, they are presumptively accurate.  Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Later, B.L.T.'s parents provided histories that indicated that B.L.T.'s seizure lasted about an hour.  See exhibit 9 at 2 (Dr. Khuro on October 13, 2011), exhibit 10 at 1 (Dr. Sitwat on March 13, 2012).  Thus, these records provide an evidentiary basis for Ms. Toale's assertion that the seizure lasted an hour.[20]  However, a review of the earlier contemporaneous records would have placed counsel on notice that it was not likely to be one single seizure that lasted for 60 minutes continuously.  Whether the consequence of a series of intermittent series lasting one hour is the same as the consequence of a single one hour seizure is a topic on which an expert could opine.

Febrile Seizure.  In Ms. Toale's recent brief, she asserts that vaccines can provoke a fever and a fever can lead to a seizure.  Former Counsel's Br. at 9 n.6.  During the hospitalization a few days after the seizure, B.L.T. had fevers but did not have another seizure.  Exhibit 6 at 87.  Similarly, Dr. Jean, who saw B.L.T. seven days after discharge, also reported that after B.L.T. came home, she had no more seizures despite having fevers "off and on."  Exhibit 5 at 29.  Likewise, Dr. Sitwat recorded that B.L.T. has had no seizures with and without fever.  Exhibit 10 at 1.

Consequently, these medical records suggest that fevers did not trigger seizures in B.L.T. in October 2010.  Again, an expert might explain why a fever in the context of vaccination could trigger a seizure but fevers outside the context of vaccination did not.  In any event, the presence of fevers so close in time to vaccination that did not cause seizures puts Ms. Toale on notice that B.L.T.'s case was not straightforward and required consideration from an expert.

Interval to Next Potential Event.  In Ms. Toale's view, because the vaccine – fever – seizure link could be taken for granted, B.L.T.'s case "presented a sequela issue."  Former Counsel's Br. at 9 n.6.  This argument does not meaningfully advance Ms. Toale's argument that reasonable basis supported the claims in her

---

[20] A citation from Ms. Toale to the underlying records in her brief would have been helpful.

petition because the petition, consistent with Section 11(c)(1)(D), asserted that B.L.T.'s problems lasted more than six months.

After the seizure on October 18, 2010, B.L.T. remained relatively healthy. She saw Dr. Jean in December 2010 and February 2011 for unrelated problems. Exhibit 5 at 33-37. In March 2011, when B.L.T.'s development was assessed, she was found to be within normal limits. Exhibit 2 at 8-19. Later in March, B.L.T. visited the Wheeling Hospital on two days and on both occasions, B.L.T.'s parents did not express any concerns about her development. The omission of any report of staring episodes or jerky behavior in these medical records suggests, but does not establish conclusively, that B.L.T. was not having staring episodes or jerky behavior. See Cucuras, 993 F.2d at 1528.

The first report of jerking behavior appears in Dr. Kitts's March 30, 2011 report. Exhibit 3 at 14. The latency between the October 18, 2010 seizure and the report of jerking on March 30, 2011 is approximately five months. It would be unusual to argue that the seizure caused the jerkiness when so much time passed. See R.V. v. Sec'y of Health & Human Servs., No. 08-504V, 2016 WL 3882519, at * 35-36 (Fed. Cl. Spec. Mstr. Feb. 19, 2016) (finding that petitioners failed to establish their child suffered a neurologic complication to a vaccination when the contemporaneously created medical records did not document a change in the child's functioning), mot. for rev. denied, 127 Fed. Cl. 136 (2016), appeal docketed, No. 2016-2400 (Fed. Cir. July 29, 2016).

Normal EEGs. In the initial hospitalization, B.L.T. had an EEG, which was normal. Exhibit 6 at 86 (Oct. 22, 2010). When she saw a neurologist, Dr. Khuro, about a year later, the EEG was also normal. Exhibit 9 at 9 (Oct. 13, 2011); see also id. at 5.

Although these EEGs could be criticized for lasting an insufficient duration, the same criticism does not hold true for the February 5, 2012 EEG at Pittsburgh Children's Hospital. That EEG lasted 23 hours and the doctors determined that what the parents were reporting as unusual behavior did not correlate to a seizure on the EEG. Exhibit 27 at 79.

The EEGs, therefore, confirm the treating doctors' opinion that B.L.T. was not having seizures. They expressed this opinion repeatedly. The fact that B.L.T. experienced only one seizure after vaccination distinguishes B.L.T.'s case from cases that have been compensated for a seizure disorder. Although the Secretary pointed out this difference, see Resp't's Reply regarding Reasonable Basis, at 3,

Ms. Toale continued to attempt to analogize to seizure disorder cases. But, this comparison was misplaced.

Medications. Ms. Toale asserted "Even if B.L.T. was no longer having active seizures, she had been on seizure medication, which can have untoward side effects." Ms. Toale cites no records to support this assertion. Former Counsel's Br. at 14.

Ms. Toale's reference to medication is unclear. When B.L.T. was discharged after the hospitalization associated with the single seizure she experienced, she was not taking any medications. Exhibit 6 at 82. Dr. Sitwat prescribed Diastat to be used as a rescue medication for seizures lasting several minutes. Exhibit 1 at 4; see also exhibit 10 at 1. However, there appears to be no record documenting that B.L.T. received Diastat. When B.L.T. returned to Wheeling Hospital for vomiting in March 2011, she was not taking any medications. Exhibit 6 at 284.

Furthermore, the statement that some unspecified medication "can have untoward side effects," does not advance the argument that B.L.T. had any problem lasting more than six months. Ms. Toale has not cited any evidence that even remotely suggests that B.L.T. suffered any side effects from this unspecified medication.

Overall, the normal EEGs, especially the normal EEG from Pittsburgh, strongly indicate that the October 18, 2010 seizure did not have any lasting consequence. This information, when combined with the other factors discussed above, creates gaps and holes in Ms. Toale's case that she should have recognized when she reviewed the medical records before filing the petition. Whether these deficiencies were solvable depended upon an expert.

Ms. Toale filed the petition on March 4, 2013. However, she waited until June 24, 2013 to contact a potential expert, Dr. Kinsbourne. Ms. Toale has not attempted, in any way, to explain this delay. If, in June 2013, Ms. Toale knew Ms. Bates was required to present a "medical opinion" to substantiate her claim (see section 13(a)(1)), Ms. Toale should have known that an expert was required in March 2013.

Dr. Kinsbourne completed his review in early August 2013. After Dr. Kinsbourne reported back to Ms. Toale, the timesheets do not suggest that Ms. Toale made any effort to retain another expert in 2013. Instead, Ms. Toale's plan was to receive compensation for her previous work through an award of attorneys'

fees and costs on an interim basis and then to withdraw from the case. Pet'r's Status Rep., filed Feb. 28, 2014.

The Secretary's challenge to reasonable basis apparently spurred Ms. Toale to take additional steps, primarily communicating with doctors who treated B.L.T. Again, Ms. Toale has not explained why she did not communicate with these doctors much sooner. Ms. Bates's need for a medical opinion or medical record supporting her case was as great in March 2013 as it was in May 2014.

In sum, the record in this case, especially the timesheets, demonstrates that Ms. Toale had an adequate amount of time to investigate whether "medical records" supported the claim that was eventually contained in the petition. The Vaccine Act requires that attorneys submit supporting documentation that the petitioner received a vaccine and suffered an injury. See 42 U.S.C. § 300aa—11(c). A thorough review of those records would have revealed that although B.L.T. suffered a seizure a few days after vaccination, B.L.T.'s parents did not report anything resembling neurologic problems for approximately five months and B.L.T.'s doctors determined that she was not having additional seizures. When the "medical records" do not provide any evidentiary support for the claim contained in the petition, it was incumbent on the petitioner's attorney to seek a "medical opinion." Ms. Toale also had an adequate amount of time to seek this medical opinion before filing the petition.

Instead of assessing the strength and weaknesses of Ms. Bates's case before filing the petition, Ms. Toale appears to have deferred that analysis until after the petition was filed. In accord with this practice, Ms. Toale has cited various decisions — none of which are binding precedent — that found reasonable basis in the absence of a medical record or medical opinion. The undersigned respectfully disagrees with those decisions because they generally fail to address the language in the Vaccine Act that directs petitioners to file complete petitions.

Instead of starting with the language of the statute, those decisions rely upon the more nebulous goal of paying petitioners' attorneys to create a group of attorneys willing to represent petitioners in the Vaccine Program. The Federal Circuit has promoted this goal in its jurisprudence. See Saunders v. Sec'y of Health & Human Servs., 25 F.3d 1031, 1035 (Fed. Cir. 1994).

On the other hand, Congress did not require payment to petitioners' attorneys in all cases. Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375, 1377 (Fed. Cir. 1994). Congress clearly distinguished unsuccessful cases that are grounded on a reasonable basis from non-meritorious cases that lack a reasonable

basis.  To be consistent with Congress's goal in this respect, the term "reasonable basis" must have some meaning.  Furthermore, it is hardly clear that Ms. Toale's decision to file a petition on Ms. Bates's behalf without first conducting a thorough review of the medical records and obtaining an expert's support is a good result from a policy perspective.

This relatively lengthy examination of Ms. Toale's conduct reinforces the undersigned's view that the actions and omissions of an attorney should not be a factor in assessing the reasonable basis.  If the reasonable basis analysis considered only evidence relevant to the "claims for which the petition was brought," special masters would not have to delve into the more sensitive aspects of an attorney's practice to figure out what the attorney should have known and when the attorney should have known it.  But, if attorneys' like Ms. Toale argue their conduct can confer reasonable basis on the petitions they file, then they open the door to an inquiry about their actions.  See Simmons v. Sec'y of Health & Human Servs., No. 13-825V, 2016 WL 5937825, at *4 (Fed. Cl. Oct. 12, 2016) (determining that an attorney who filed a case shortly before the running of the statute of limitations still must establish a reasonable basis for the petition).  For this particular case — unlike the vast majority of cases in which Ms. Toale has represented petitioners in the Vaccine Program, she did not act with appropriate diligence.

**V.    Conclusion**

To be eligible for an award of attorneys' fees and costs, Ms. Bates is required to establish her good faith in bringing the petition and that the claim for which the petition was brought was supported by reasonable basis.  Ms. Bates has not established a reasonable basis for her petition.  Therefore, she is not eligible for an award of attorneys' fees and costs.

The Clerk's Office is instructed to mail a copy of this decision to Ms. Bates by certified mail.  The Clerk's Office is further instructed to deliver a copy of this decision to Ms. Toale's office by electronic means immediately after a version becomes available to the public.

**IT IS SO ORDERED**.

Christian J. Moran
Special Master